**Superintendent E. C. WATKINS et al., Appellants,**

v.

**Willie FOSTER, Jr., Appellee.**

**No. 77–1014.**

United States Court of Appeals, Fourth Circuit.

Argued May 3, 1977.

Decided Jan. 26, 1978.

---

Patricia B. Hodulik, Associate Atty., Raleigh, N. C. (Rufus L. Edmisten, Atty. Gen. of N. C., Raleigh, N. C., on brief), for appellants.

Valerie K. Leonhart, Baltimore, Md., and Brigid K. Henrie, Third Year Law Student (Michael S. Elder, Michael A. Millemann, Joyce R. Branda, The Legal Services Clinic, Baltimore, Md., on brief), for appellee.

Before RUSSELL, WIDENER and MOORE,* Circuit Judges.

MOORE, Circuit Judge:

On February 19, 1973, Willie Foster was tried in a North Carolina state court for first degree burglary. The prosecution's only evidence was a photographic enlargement of a fingerprint matching Foster's, found on a flowerpot in the burglarized house. The television set, record player, and cash, which were missing from the house, were never recovered. No identification was made of Foster. Foster and his wife both testified that he was at home on the night of the alleged burglary. On cross-examination, the prosecutor asked Foster, in detailed questions, whether he had committed six prior acts involving breaking into people's homes. Foster denied committing any of them. The jury found Foster guilty and he was sentenced to life imprisonment.

We hold that the cross-examination as to prior acts was highly prejudical and deprived Foster of a fair trial. Accordingly, we affirm the district court's judgment, granting a writ of habeas corpus and setting aside Foster's conviction.

I.

Early in the morning of September 5, 1972, the home of James Harley Davis was burglarized. As a result of a fresh paint job in Mr. Davis's son's room, he and his son had gone to sleep on the evening of September 4 in Mr. Davis's daughter's bedroom. Mrs. Davis and her daughter went to sleep in the master bedroom. At approximately 1:50 a. m., Mrs. Davis awoke to find a man leaning over her with his hands on

---

* LEONARD P. MOORE, United States Circuit Judge for the Second Circuit, sitting by designation.

her arm and leg. The only identification of the intruder that Mrs. Davis has been able to give is that he "looked like a man", that he was wearing a dark jacket with two white stripes down the sleeves, and that he was wearing a mask or a stocking over his head. Upon awakening, Mrs. Davis called for her husband and then screamed. The unidentified man struck her in the face and ran from her room. Mr. Davis, awakened by the scream, searched for the intruder, but found no one. The Davises then noticed that the television set, the record player, and some money from Mr. Davis's wallet were all missing. The screen on one of the open windows in the son's bedroom, which was empty that evening, had been removed.

The police arrived and dusted for fingerprints around the open window. They were unable to take any prints from that area, but successfully lifted three prints from a plastic flowerpot which was found in the middle of the living room, although it had been in the corner of the room, next to the television set, when the Davises had gone to bed.

One of the prints was found to match a fingerprint which the police had on file as belonging to Willie Foster, Jr.[1] Accordingly, on October 22, 1971, Foster was arrested. Two of the warrants on which Foster was arrested related to the September 5 incident—i. e., first degree burglary from James Harley Davis, and assault with intent to rape Mrs. Davis. However, Foster was also arrested on the basis of seven other warrants which related to seven separate incidents of burglary and housebreaking which had occurred in Charlotte between February and October of that year.

A grand jury returned nine indictments against Foster on January 3, 1972. The following May, Foster was tried on the two indictments relating to the September 5 incident at the Davis home. The jury found Davis guilty of first degree burglary, but acquitted him on the assault with intent to rape charge. On the jury's recommendation, Foster was given a life sentence. Foster's conviction was reversed, however, by the Supreme Court of North Carolina on the ground that certain prejudicial hearsay testimony had been elicited from Foster on cross-examination. *State v. Foster*, 282 N.C. 189, 192 S.E.2d 320 (1972).

Foster was retried on February 19, 1973. Mr. and Mrs. Davis each testified to the September 5th events, as related above. In addition, Mrs. Davis testified that she did not know Foster and that, to her knowledge, he had never been in her home. She stated also that the flowerpot from which the fingerprints were lifted was always kept in the living room. The rest of the State's case consisted of the testimony of three police officers and of a fingerprint expert, all relating to the fingerprint on the flowerpot. The original 3″ × 5″ card on which the print alleged to be Foster's had first been placed had been lost prior to the trial, and thus a photographic enlargement of the print was introduced.[2] The fingerprint expert testified that the enlarged print matched a print taken from Foster after his arrest.[3]

The defense offered no explanation of the fingerprint on the flowerpot. However,

1. It has never been explained why Foster, who had no previous criminal record, had his fingerprints on file at the police department.

2. Foster argued on appeal to the North Carolina Supreme Court that the photographic enlargement should not have been admitted because it had not been established that the photograph in fact represented the print which had been lifted from the flowerpot in the Davis home. The North Carolina Supreme Court, after discussing the issue extensively, held that the photograph was properly admitted. *State v. Foster*, 284 N.C. 259, 200 S.E.2d 782, 789–93 (1973). Foster did not raise the issue in his

habeas petition and thus it is not in issue on this appeal.

3. Although only the fingerprint taken from Foster after his arrest was introduced into evidence, one of the officers also referred in his testimony to the fingerprint, allegedly Foster's, which was already on file. The North Carolina Supreme Court held that this testimony was hearsay and should have been excluded, but concluded that the error was harmless. 200 S.E.2d at 793–94. Foster did not raise this issue in his habeas petition, and thus it, also, is not in issue on this appeal.

Foster testified that he had never been in the Davis home and that he had never owned a mask or a dark jacket with white stripes. Foster, a 34-year old black, with no prior criminal record, testified that he had lived in Charlotte for 25 years, that he worked for the Triple A Heating and Cooling Company and the Quail Hollow Country Club, and that he also did yard work for various people in Charlotte. Mrs. Henry Wilson testified that Foster had done yard work and heavy indoor work for her for two or three years. She stated that his reputation in the community was excellent and that he was considered an honest and conscientious worker. Foster's wife testified that her husband was at home in bed with her during the hours in which the Davis home was allegedly burglarized. She testified further that she had never seen a mask or a dark jacket with white stripes at the house, that she and her husband had never owned a television set, and that her husband did not bring one home on September 5, 1971.

We come now to the portion of the trial which is directly at issue on this appeal. During his cross-examination of Foster, the prosecutor asked Foster whether he had committed six prior acts of breaking into people's homes. The prosecutor described each act in some detail, and Foster denied involvement in any of them:

"Q. Now, I will ask you if on October 20, of 19, excuse me, on August 3, of 1971 if you didn't break into Martha W. Pitts' house . . .

MR. HICKS: Objection.

Q. At 2416 Rozzelles Ferry Road here in the City?

MR. HICKS: Objection.

A. No, I sure didn't.

MR. HICKS: I object to a question like this.

Q. Did you touch anything around the screen window there?

A. I wasn't there.

\* \* \* \* \* \*

Q. I will ask you if you didn't break in the residence of James Sinclair at 312 Center Street on October 11, 1971, by going into the front door and reaching up and unscrewing with your fingers a light-bulb in the ceiling?

MR. HICKS: Objection.

COURT: Overruled.

DEFENDANT'S EXCEPTION NO. 24

Q. Did you or did you not?

A. What you mean 'did I'? No, I didn't.

Q. I will ask you if you didn't break into the residence of Lonnie Bell Wallace at 217 South Turner Street? How far is South Turner Street from there on Center Street?

MR. HICKS: Objection.

A. I couldn't tell you.

Q. I will ask you if you didn't break into Lonnie Bell Wallace's house on February 20, 1971, between 6:30 and 11:00 o'clock and by breaking out the center glass window in the front door?

MR. HICKS: Objection.

COURT: Overruled.

DEFENDANT'S EXCEPTION NO. 25

A. Sure didn't.

Q. I will ask you if you did not break into the residence of Teretha Phillips at 2224 Roslyn Avenue on the 23rd of May, 1971, by prying open her kitchen window and breaking out the window pane?

MR. HICKS: Objection.

COURT: Overruled.

DEFENDANT'S EXCEPTION NO. 26

A. Sure didn't.

Q. I will ask you if on the 17th of September, 1971, you didn't break into the home of Shirley Torrence at 514 Honeywood, Apartment No. 3, by taking the screen off the window and breaking out the front window?

MR. HICKS: Objection.

COURT: Overruled.

DEFENDANT'S EXCEPTION NO. 27

A. Sure didn't.

Q. And I will ask you if you on the 25th day of July 1971 you didn't break into the residence of Roy Lee Armstrong at 201 South Turner Avenue?

MR. HICKS: Objection.

COURT: Overruled.

DEFENDANT'S EXCEPTION NO. 28

    A. Sure didn't.

    Q. Do you know where South Turner Avenue is?

    MR. HICKS: Objection.

    COURT: Overruled.

DEFENDANT'S EXCEPTION NO. 29

    A. Sure don't." State Record Summary at 74–77.

The six acts described by the prosecutor were the acts Foster was charged with committing in six of the indictments which had been returned against him on January 3, 1972. At the time of Foster's cross-examination, one of these six indictments had already been dismissed. The remaining indictments against Foster were all dismissed for insufficient evidence not long thereafter.

The jury found Foster guilty, and he was again sentenced to life imprisonment. The Supreme Court of North Carolina affirmed the conviction, with two justices dissenting on the prior acts issue. *State v. Foster*, 284 N.C. 259, 200 S.E.2d 782 (1973).

On August 19, 1975, Foster filed a *pro se* petition for a writ of habeas corpus in the United States District Court for the Western District of North Carolina. A further petition was later filed by Foster's court-appointed counsel. In an order dated November 8, 1976, Judge McMillan recognized that "[o]rdinarily federal habeas corpus does not lie to correct error in cross-examination," but asserted that in this instance: "To allow the prosecutor to ask questions about other alleged crimes, completely unsupported by fact or evidence, in the detail which was allowed here, makes a shambles of fair trial and deprives the defendant of due process of law". Judge McMillan concluded that "Foster is entitled to a new trial at which *no examination with reference to the six alleged previous wrongful acts should be allowed*". *Foster v. Watkins*, 423 F.Supp. 53, 55 (W.D.N.C.1976). Accordingly, Judge McMillan granted the writ of habeas corpus and set aside Foster's conviction.

## II.

The only issue raised on this appeal is whether the cross-examination of Foster as to six alleged prior acts deprived him of a fair trial.

■ Foster does not contest the validity of the North Carolina evidentiary rule which permits cross-examination of a witness as to prior acts for the purpose of impeachment. *State v. Neal*, 222 N.C. 546, 23 S.E.2d 911, 912 (1943); *State v. Williams*, 279 N.C. 663, 675, 185 S.E.2d 174, 181 (1971); *State v. Gainey*, 280 N.C. 366, 185 S.E.2d 874, 879 (1972). The North Carolina courts have placed two limitations on this general rule: (1) the questioning must be in good faith, *State v. Mack*, 282 N.C. 334, 193 S.E.2d 71, 76 (1972); and (2) the cross-examiner is bound by the witness's answer—he cannot offer extrinsic evidence in rebuttal. *State v. Cross*, 284 N.C. 174, 200 S.E.2d 27, 30 (1973).

■ The latter limitation is not in issue here. The prosecutor offered no evidence to rebut Foster's negative answers to each of the six contested questions. It is the prosecutor's good faith which is in question. Appellants concede that "the [good faith] requirement is directed to insuring that the questions asked are based upon factual material". Appellants' Brief at 8. Although the questions were based upon alleged acts as to which indictments had been returned, Chief Justice Bobbitt noted in his dissent from the second opinion of the North Carolina Supreme Court:

"The delay in prosecution notwithstanding defendant's repeated requests for preliminary hearings suggests that the State's evidence is insufficient to show that any of these alleged crimes was committed by defendant. The State elected to proceed only in a case which rested solely on a single fingerprint, presumably its strongest case." 200 S.E.2d at 799.

He added:

"The asking of these questions gave the impression that the State's counsel had knowledge of evidential facts sufficient to support these insinuations. The record

tends to negate rather than to support the view that he had such knowledge." 200 S.E.2d at 799.[4]

Chief Justice Bobbitt's conclusion that the mere fact that indictments had been returned did not mean that the cross-examination had a factual basis was soon borne out. Shortly after the North Carolina Supreme Court issued its decision, all of the indictments still pending against Foster were dismissed for a lack of sufficient evidence. What Chief Justice Bobbitt did not realize[5] was that one of the indictments, which charged Foster with committing the act on which one of the six questions was based, had already been dismissed prior to the trial. This fact alone sheds doubt on the prosecutor's good faith.

■ The prosecutor concededly could not, and did not, offer any extrinsic evidence that Foster had committed the six acts. However, his questions alone, although answered in the negative by Foster, must have left an indelible impression on the minds of the jury. Foster's entire defense rested on his credibility, and thus the prosecutor's attack on this credibility was critical. Foster's denial of the prosecutor's insinuations in theory should have left his credibility intact but in actuality could not erase the blemish on his character which had been left in each juror's mind. Aggravating the highly prejudicial nature of the questions was the fact that the trial judge never gave the jury any limiting instructions—never told them that they could only consider the exchange between the prosecutor and Foster on the issue of Foster's credibility and never reminded them that

nothing the prosecutor said was itself evidence.

The evidence which the jury could properly consider on the issue of Foster's guilt was slim.[6] Appellants concede that "the quantity of evidence to support petitioner's conviction was not great". Appellants' Brief at 16. The District Court said:

"It must be borne in mind that the prosecution's case depended upon a number of extended inferences from one limited piece of evidence—second-hand and questionable evidence of a single latent fingerprint on a flower pot. From the second-hand evidence that a fingerprint was found on a flower pot, the jury were asked to draw inferences (a) that the photograph they saw was in fact the photograph of the original fingerprint; (b) that this was in fact the defendant's fingerprint; (c) that it had been placed upon the flower pot while the flower pot was in the prosecuting witness's house; (d) that it had been placed upon the flower pot at *the time of the crime* rather than at some other time; (e) that it had been placed upon the flower pot by one who was then and there perpetrating a burglary; (f) that the person then and there perpetrating the burglary was the defendant; (g) that the defendant at such time in fact did have the necessary *intention* or mental state necessary to support conviction of a crime serious enough to justify taking his life." 423 F.Supp. at 55 (emphasis in the original).

We can only add that no identification of Foster was ever made, and the fruits of the crime were never recovered.

**4.** The majority of the North Carolina Supreme Court did not discuss the application of the "prior acts" rule to the facts of Foster's case. They merely reaffirmed the validity of the rule and hence denied Foster's request that they reexamine and repudiate it. 200 S.E.2d at 794.

**5.** Chief Justice Bobbitt stated that "the record shows that defendant is under indictment for each of the six criminal offenses to which the cross-examiner's questions relate . . . ." 200 S.E.2d at 799.

**6.** Contrary to appellants' charge, we are not reviewing the sufficiency of the evidence. We merely view the scarcity of the evidence as relevant to the issue of whether the prosecu-

tor's improper cross-examination was so prejudicial as to deprive Foster of a fair trial. "The question is whether there is a reasonable possibility that the [improper cross-examination] . . . might have contributed to the conviction." *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963). If the other evidence in the case had been overwhelming, the answer to this question would be "no". *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). The fact that the other evidence was far from overwhelming is one factor buttressing the possibility that the improper cross-examination did contribute to the conviction.

Foster has a right to be tried on this scarce evidence alone. Because of the "reasonable possibility", *Fahy v. Connecticut, supra* note 6, that Foster was tried not only on the evidence, but also on the detailed "facts" recounted in the prosecutor's questions, with no limiting instructions by the judge, Foster was deprived of his constitutional right to a fair trial. Accordingly, we affirm the District Court's judgment granting a writ of habeas corpus and setting aside Foster's conviction. If appellants wish to give Foster a new trial, with no reference to the six alleged prior acts, they should do so forthwith, or else release him. Foster was in prison for seven months before his first trial, has now been in prison for a total of almost six years, and has still not received the fair trial to which the Fourteenth Amendment entitles him.

The judgment is AFFIRMED.

**WIDENER, Circuit Judge, dissenting:**

The majority affirms the district court, finding that the prosecutor's questioning "was highly prejudicial and deprived Foster of a fair trial." I respectfully dissent.

Federal courts are not ordinarily concerned with the sufficiency of evidence in habeas corpus petitions. "The only constitutional question is whether petitioner's conviction rests upon 'any evidence at all.'" *Freeman v. Slayton*, 550 F.2d 909, 911 (4th Cir. 1976), cert. den. 429 U.S. 1111, 97 S.Ct. 1150, 51 L.Ed.2d 566 (1977), quoting *Williams v. Peyton*, 414 F.2d 776 (4th Cir. 1969). Thus, the discussion of the "scarcity of the evidence," at p. 506 is immaterial. Viewing "the scarcity of the evidence as relevant to the issue of whether the prosecutor's improper cross-examination was so

prejudicial as to deprive Foster of a fair trial," p. 506, n. 6, is merely another way of stating that the majority is impermissibly considering the weight of the evidence despite its disavowal. I note in passing that this court has affirmed a federal conviction in which the only evidence of guilt was the presence of the accused's fingerprint near the scene of the crime. *United States v. Bryant*, 454 F.2d 248 (4th Cir. 1972). As it considers the weight of the evidence here, the majority applies a more stringent standard in a State habeas corpus review than was applied in a federal criminal appeal in *Bryant*. Exactly the reverse should be true.

Turning to the questions themselves, the majority attacks the prosecutor's good faith in asking them. In the teeth of a contrary decision by the North Carolina Supreme Court,[1] and despite 28 U.S.C. § 2254(d), which provides that the North Carolina court's determination "shall be presumed to be correct," the majority finds that the prosecutor failed to act in good faith. The majority seems to base its necessarily subjective determination of bad faith solely upon the State's dismissal for "lack of sufficient evidence" of the indictments on which the questions were premised.[2] p. 506. However, the sole support in the record for this is the following statement by the State in its answer: "these cases were apparently untried for lack of sufficient evidence." Fairly read, the passage shows only that the prosecuting authorities lacked sufficient evidence to convict Foster of the crimes charged in the dismissed indictments; that is, evidence establishing his guilt beyond a reasonable doubt.

A fair reading of the majority opinion may only be that, in this circuit, as a matter

1. The majority notes that the North Carolina Supreme Court did not discuss the application of the prior acts rule in its opinion. p. 506 n. 4. Nevertheless, unless we are to reverse North Carolina's highest court on its interpretation of an admittedly constitutional State law, we are bound to agree that the State Supreme Court followed its own decisions and found the requisite good faith.

2. As the majority states, p. 506, one of the indictments was dismissed prior to trial. Even

were I to agree, which I do not, that the prosecutor unconstitutionally questioned Foster about the acts charged in that particular indictment, I would find any error to have been harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). I am in positive disagreement with the conclusion of the majority on p. 506 as to that indictment, that "This fact *alone*, sheds doubt on the prosecutor's good faith." (Italics added).

of constitutional law, prior acts impeachment is permissible only when the prosecutor possesses evidence proving the prior acts beyond a reasonable doubt. For, if there should be a lesser standard applied, such as preponderance of the evidence or probable cause,[3] to permit constitutionally a prosecutor to question an accused as to prior acts, the decision of the district court must be reversed. The record permits no conclusion except that the State lacked evidence to support the indictments beyond a reasonable doubt, and in the absence of any other evidence, the prisoner must be taken to have failed to meet his burden of proof.

Finally, this circuit, in many cases, has approved the admission of evidence of prior acts as evidence in federal criminal prosecutions. In *United States v. Woods*, 484 F.2d 127 (4th Cir. 1973), evidence of prior acts was admitted as proof of the substantive offense, although there were neither indictments nor convictions on account of such acts. In *United States v. Tibbetts*, 565 F.2d 867 (4th Cir. 1977), this court approved the admission of a December 10, 1975 telephone call of a bomb threat, for which the defendant was not indicted, as evidence in a charge of making a bomb threat on May 3, 1976, for which the defendant was indicted and tried. This court approved admission of the evidence, not as proof of the substantive offense, nor even to show intent, but "to account for the surveillance and as explanation of how the government discovered suspects of this type of crime." In *United States v. Tyler*, 565 F.2d 160 (4th Cir. 1977), the court approved the admission of a statement by the defendant's sister-in-law that the defendant had assisted other escaped convicts when the crime for which the defendant was charged was aiding one Brewster in the transportation of a stolen motor vehicle in interstate commerce. Brewster happened to be an escaped convict. In *Tyler*, the evidence was received

for the purpose of showing motive and intent.

In the face of these cases, I do not see how a State court may be forbidden, under constitutional prohibition, to permit the questioning of a defendant about prior acts for impeachment purposes, while a federal court in the same circuit may admit the same evidence as going either to proof of guilt or innocence, or as to motive and intent, a necessary ingredient of guilt, or even to explain the government's actions. I think we apply a double standard, State and federal, and even in the application of the double standard, I think we apply it wrongly, for error of constitutional dimension to set aside a State conviction necessarily ought to be more grievous than merely error in the admissibility of evidence, all that is necessary to vacate a judgment of conviction in the federal courts.

I would reverse.

---

**3.** An indictment is not, of course, admissible evidence of guilt. But the indictments unquestionably provided probable cause for any pretrial incarceration of Foster, see *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54

(1975). If Foster could be jailed because of the acts alleged in the indictment, I do not think it unfair that he be questioned about the same acts if permitted by State law.